**UNITED STATES DISTRICT COURT**
**FOR THE EASTERN DISTRICT OF MICHIGAN**

| | |
|---|---|
| LAUREL HILBERT,<br>2039 New Hampshire Avenue, N.W.<br>Washington, D.C. 20009<br><br>*Plaintiff,*<br><br>v.<br><br>ATHENEUM HOTEL CORPORATION<br>1000 Brush Street<br>Detroit MI, 48226<br><br>SERVE:<br>DIMITRIOS PAPAS, Registered Agent<br>1216 Beaubien Street<br>Detroit MI, 48226<br><br>*Defendant.* | **Case No. 2:24-cv-10413**<br><br><br><br><br>**Class Action Complaint**<br><br>**Jury Trial Demand** |

**VERIFIED COMPLAINT**

**INTRODUCTION**

1.  Plaintiff, Mr. Laurel Hilbert asserts the following claims against Defendant ATHENEUM

    HOTEL CORPORATION ("Defendant") as follows:

2.  The Supreme Court of the United States has stated "[t]he Internet's prevalence and power

    have changed the dynamics of the national economy." *South Dakota v. Wayfair, Inc.*, 138

    S. Ct. 2080, 2097 (2018) (the Court noted that in 1992, less than two (2) percent of

    Americans had Internet access whereas by 2018 the number increased to roughly eighty-

nine (89) percent).  This number has steadily increased as polling data from 2021 shows ninety-three (93) percent of American adults use the Internet.[1]

3.      Based on a 2018 report, over forty (40) million people in the United States were documented with a disability, including over seven and a half (7.5) million individuals who have a visual disability.[2]  According to the National Federation of the Blind's 2016 report (updated in 2019), approximately 16,400 visually impaired persons lived in the District of Columbia and approximately 223,500 such persons live in Michigan.[3]

4.      Plaintiff brings this civil rights action against Defendant for its failure to design, construct, maintain, update and operate its website (hereinafter "Website") to be fully accessible to and independently usable by Plaintiff and other blind or visually impaired people.

5.      Plaintiff uses the terms "blind" or "visually impaired" interchangeably to refer to all people with visual impairments who meet the legal definition of blindness in that they have a visual acuity with correction of less than or equal to 20 x 200.

6.      For this significant portion of Americans, accessing websites, mobile applications, and other information has become a necessity, not a convenience.

---

[1]      Internet/Broadband Fact Sheet, PEW RESEARCH CENTER (April 7, 2021) https://www.pewresearch.org/internet/fact-sheet/internet-broadband/ (last visited November 23, 2022).  Indeed, the polls also show ninety-nine (99) percent of American adults between the ages of eighteen (18) to twenty-nine (29) use the Internet, and ninety-eight (98) percent of American adults between the ages of thirty (30) to forty-nine (49) use the Internet.

[2]      Lee W. Erickson & S. von Schrader, *2018 Disability Status Report: United States*, CORNELL UNIVERSITY 10 (2020), https://www.disabilitystatistics.org/StatusReports/2018-PDF/2018-StatusReport_US.pdf (last visited November 23, 2022).  The report uses data from the 2018 American Community Survey.

[3]      Blindness Statistics, National Federation of the Blind (updated January 2019) https://nfb.org/resources/blindness-statistics (last visited February 6, 2024).

7.      The growth of usage is rivaled only by the myriad ways in which users can harness the capabilities of the internet for the betterment of their lives through education, employment, entertainment, commerce, and countless other pursuits.

8.      The U.S. Chamber of Commerce has documented consumers' increasing reliance on the internet to shop online:

> The average consumer spends more than $1,700 per year on online shopping, a number that's continuing to rise. The convenience, affordability and ability to compare prices with ease has led more and more customers to visit e-commerce sites before heading to a brick-and-mortar location.[4]
> New research by Leanplum found that 95% of consumers will buy at least half of their gifts online. Shoppers, especially millennials and Gen Zers, favor the convenience and the great offers and discounts associated more with shopping online than visiting a brick-and-mortar location. It's these groups that are driving e-commerce retailers to be strategic with their website design. The Leanplum survey found that 80% of respondents shop on their mobile devices.[5]

9.      Even the Supreme Court has acknowledged the phrase, "'There's an app for that' has become part of the 21st-century American lexicon." *Apple Inc. v. Pepper*, 139 S. Ct. 1514, 1518, 203 L.Ed.2d 802, 806 (2019).

10.     But "[a]s technology continues to evolve at a rapid pace, it is important to consider factors that can facilitate or impede technology adoption and use by people with disabilities."[6]

---

[4]     Emily Heaslip, *A Guide to Building an Online Store*, U.S. Chamber of Commerce (Sept. 20, 2019), https://www.uschamber.com/co/start/startup/how-to-build-online-stores (last accessed September 8, 2023).

[5]     Emily Heaslip, *5 Ways to Optimize Your E-Commerce Site for Mobile Shopping*, U.S. Chamber of Commerce (Jan. 6, 2020), https://www.uschamber.com/co/run/technology/building-mobile- friendly-ecommerce-websites (last accessed June 14, 2022). "According to one report, e- commerce is growing 23% each year[.]" Emily Heaslip, *The Complete Guide to Selling Online*, U.S. Chamber of Commerce (Jan. 28, 2020), https://www.uschamber.com/co/run/technology/small-business-ecommerce-guide (last accessed September 8, 2023).

[6]     *National Disability Policy: A Progress Report*, Nat'l Council on Disability (Oct. 7, 2016), https://ncd.gov/sites/default/files/NCD_ProgressReport_ES_508.pdf (last accessed September 8, 2023).

11.     This is especially true with respect to accessing goods and services over the internet,

where people with disabilities stand to benefit immensely if online services were fully

and equally accessible to them. The National Federation of the Blind explains:

> In many ways, individuals with disabilities rely on Web content more so than
> their nondisabled peers because of inherent transportation, communication,
> and other barriers. A blind person does not have the same autonomy to drive
> to a covered entity's office as a sighted person. A deaf or hard of hearing
> person does not have the same opportunity to call a covered entity's office.
> A person with an intellectual disability does not have the same ability to
> interact independently with the staff at a covered entity's office. The 24-
> hour-a-day availability of information and transactions on covered entity
> websites and mobile apps provides a level of independence and convenience
> that cannot be replicated through any other means. That is why the number
> of Americans who rely on the Internet has increased year after year and why
> entities offer information and transactions through that unique medium.[7]

12.     When digital content is properly formatted, it is universally accessible to everyone.  When

it's not, the content provider fails to communicate to individuals with a visual disability

effectively. In turn, these individuals must expend additional time and effort to overcome

communication barriers not applicable to sighted users, which may require the assistance

of third parties or, in some instances, may deny outright access to the online service.[8]

13.     Unfortunately, Mr. Hilbert cannot fully and equally access Defendant's Website because

Defendant's accessibility policies and practices have made it impossible to fully and

---

[7]     Comment from disability rights organizations to DOJ Supplemental Advance Notice of
Proposed Rulemaking "Nondiscrimination on the Basis of Disability; Accessibility of Web
Information and Services of State and Local Government Entities," C RT Docket No 128, RIN 119
-AA65, Answer 57 (October 7, 2016) (citations omitted).

[8]     These factors often lead disabled individuals to abandon the process of purchasing items
online after they begin. Kasey Wehrum, *Your Website is Scaring Customers Away. 5 Easy Ways
to Fix It.*, Inc. Mag. (Jan. 2014), https://www.inc.com/magazine/201312/kasey-wehrum/how-to-
get- online-customers-to-complete-purchase.html (last accessed September 8, 2023) (documenting
the most common causes of shopping cart abandonment, including: "Your Checkout button is hard
to find[,]" "Shoppers question the safety of their personal info[,]" and "Getting through the
checkout process takes multiple clicks.").

equally perceive, understand, or operate the Website's content with screen reader auxiliary aids.

14. As a result, this action for injunctive relief seeks an order requiring that Defendant (a) make its Website accessible to Mr. Hilbert, and (b) adopt sufficient policies and practices, the details of which are more fully described below, to ensure the Website does not become inaccessible again in the future.

15. Defendant's denial of full and equal access to its Website and therefore denial of its goods and services offered thereby is a violation of Plaintiff's rights under Title III of the Americans with Disabilities Act ("ADA"), 42 U.S.C § 12182(a), and the Michigan Persons with Disabilities Civil Rights Act ("MPDCRA"), MCLS § 37.1101 *et seq*.

16. Because Defendant's Website is not equally accessible to blind and visually impaired consumers, they violate the ADA and the MPDCRA. Plaintiff seeks a permanent injunction, actual and liquidated damages, and reasonable attorneys' fees and costs to cause a change in Defendant's corporate policies, practices, and procedures so that Defendant's Website will become and remain accessible to blind and visually impaired consumers.

## JURISDICTION AND VENUE

17. This Court has subject-matter jurisdiction over this action under 28 U.S.C § 1331 and 42 U.S.C. § 12181 as Plaintiff's claims arise under Title III of the Americans with Disabilities Act ("ADA"), 42 U.S.C. § 12181, *et seq*. and 28 U.S.C. § 1332.

18. This Court has supplemental jurisdiction under 28 U.S.C. § 1367 over Plaintiff's claims under the Michigan Persons with Disabilities Civil Rights Act ("MPDCRA"), MCLS § 37.1101 *et seq*.

19. Venue is proper in this District under 28 U.S.C. § 1391(b)(1) and (2) because Defendant conducts and continues to conduct a substantial and significant amount of business in this District via the internet regarding the subject Website addressed by this action.

20. Defendant is subject to personal jurisdiction in this District.  Defendant has been and is committing the acts or omissions alleged herein in this District that caused some of the injury and violated the rights of Plaintiff and to other blind and visually impaired customers in this District under the ADA and the MPDCRA.  A substantial part of the acts and omissions giving rise to Plaintiff's claims occurred in this District.

21. In particular, Plaintiff has been denied the full use and enjoyment of the facilities, goods, and services offered to the general public through its Hotel Website.  Plaintiff lost all opportunities to complete a consumer business transaction being offered by Defendant due to the discriminatory roadblocks faced as a result of Defendant's failure to provide online goods and services that he could effectively utilize as a visually impaired person.

22. Further, these access barriers that Plaintiff encountered have caused a denial of Plaintiff's full and equal access multiple times in the past, and now deters Plaintiff on a regular basis from accessing the Defendant's Website in the future without the aid of a sighted person to help him navigate, which is antithetical to the freedoms promised to the visually impaired by the passage of federal and state disability civil rights legislation.

23. This Court is empowered to issue a declaratory judgment under 28 U.S.C. §§ 2201 and 2202.

## PARTIES

24. Plaintiff Laurel Hilbert ("Plaintiff" or "Mr. Hilbert") resides in Washington, D.C.  While in his residential home, he attempted to access THE ATHENEUM SUITE HOTEL AND

CONFERENCE CENTER's Website to complete a hotel reservation in preparation for a trip to Detroit, MI.  Regrettably, he was unsuccessful in completing the transaction due to the inaccessibility of the Website.

25.     Not only was Mr. Hilbert injured in fact on or about September 5, 2023 and then again on January 22, 2024 when he was prevented from making reservations through his screen reading software, but it is inevitable that the inaccessibility of Defendant's Website will injure him again as Mr. Hilbert requires travel to Detroit, MI at least several times per year for business and/or to visit relatives if it is not remediated in conformity with the Americans with Disabilities Act requirements.

26.     Plaintiff is a blind, visually-impaired handicapped person and a member of a protected class of individuals under the Americans with Disabilities Act ("ADA") pursuant to 42 U.S.C. §§ 12102(1) – (2), and the regulations implementing the ADA set forth at 28 C.F.R § 36.101 *et seq.*, and the MPDCRA.

27.     Defendant ATHENEUM HOTEL CORPORATION ("Defendant") is and was at all relevant times incorporated in Michigan and does business in the District of Columbia through its internet-based online Hotel Website.

28.     Defendant owns and administers THE ATHENEUM SUITE HOTEL AND CONFERENCE CENTER and its associated Website https://www.atheneumsuites.com/ and its goods and services online and has offered them to the general public through its Website, which is a public accommodation, as well as its physical locations, within the definition of the ADA, 42 U.S.C. § 12181(7), and the MPDCRA.

## **NATURE OF ACTION**

29. The Internet has become a significant source of information, a portal, and a tool for conducting business, doing everyday activities such as shopping, learning, banking, researching, as well as many other activities for sighted, blind and visually impaired persons alike.

30. In today's tech-savvy world, blind and visually impaired people have the ability to access websites and online platforms using keyboards in conjunction with screen access software that vocalizes the visual information found on a computer screen or displays the content on a refreshable Braille display. This technology is known as screen-reading software. Screen-reading software is currently the only method a blind or visually impaired person may independently access the internet. Unless websites and/or mobile applications are designed to be read by screen-reading software, blind and visually impaired persons are unable to fully access websites and the information, products, and goods contained thereon.

31. Blind and visually impaired users of Windows operating system-enabled computers and devices have several screen-reading software programs available to them. Some of these programs are available for purchase and other programs are available without the user having to purchase the program separately. Nonvisual Desktop Access, otherwise known as "NVDA", and "JAWS" are popular, screen-reading software programs available for a Windows computer. "VoiceOver" is a popular program for Apple devices.

32. For screen-reading software to function, the information on a website must be capable of being rendered into text. If the website content is not capable of being rendered into text, the blind or visually impaired user is unable to access the same content available to sighted users. For VoiceOver users such as Mr. Hilbert, relies on a Website's features and proper

coding, including but not limited to "ARIA" ("accessible rich internet applications") in the Web Content Accessibility Guidelines ("WCAG"). ARIA provides what is presented visually for a visually impaired person.

33. The international website standards organization, the World Wide Web Consortium, known throughout the world as "W3C," has published version 2.1 of the Web Content Accessibility Guidelines ("WCAG 2.1"). WCAG 2.1 are well-established guidelines for making websites accessible to blind and visually impaired people. These guidelines are universally followed by most large business entities and government agencies to ensure their websites are accessible.

## STATEMENT OF FACTS

34. Defendant ATHENEUM HOTEL CORPORATION ("Defendant") is a corporation that owns and operates THE ATHENEUM SUITE HOTEL AND CONFERENCE CENTER and its associated online website offering features which should allow all consumers to access the goods and services provided via the internet throughout the United States, including the District of Columbia.

35. Defendant's Website offers its products and services to the public. The Website offers features which ought to allow and avail consumers of the ability to peruse numerous functions to complete a sought-after business transaction, including, as in Mr. Hilbert's case, the ability to book a reservation.

36. Plaintiff Laurel Hilbert is a visually impaired and legally blind person, who cannot use a computer without the assistance of screen-reading software. Plaintiff is, however, a proficient VoiceOver screen-reader user and uses primarily VoiceOver to access the

internet, online programs within websites and/or mobile applications.  Plaintiff has visited and attempted to access Defendant's Website using a screen-reader on numerous occasions.

37.  While residing in the District of Columbia in September 2023 and again in January 2024, Plaintiff visited and attempted to access Defendant's Website using screen-reading software in order to make a reservation at Defendant's hotel through its Website. Regrettably, he was unable to do so due to inaccessibility issues.

38.  Despite his efforts, Plaintiff was denied a user experience similar to that of a sighted individual due to the Website's lack of a variety of features and accommodations, which effectively barred Plaintiff from being able to enjoy the privileges and benefits of Defendant's goods and services.

39.  Mr. Hilbert owns and uses a MacBook and uses Safari as his main internet browser.  Safari and MacBook harnesses Apple's "Voice-Over Software" which enables blind and/or visually impaired persons such as Mr. Hilbert to access and enjoy websites by reading aloud functions on a website.

40.  Screen-reading software includes the functionality "Quick Navigation," which enables screen readers to navigate through a website using its headings, links, buttons, tables, etc. Specifically, when a screen reader types letters, they correspond to what kind of functions a screen reader uses to learn what it is that a website offers.  For example, if Mr. Hilbert enables "Quick Navigation," he can navigate through a website by using its headings.  He will press "H" on his keyboard once "Quick Navigation" is enabled.

41.  When websites fail to incorporate the proper and descriptive coding to mark what kinds of functions are on their website, not only does this prevent the "Quick Navigation" functionality to locate the functions on the website, but also the read-aloud functions that

lack description confuse software users like Mr. Hilbert who cannot rely on any visuals to navigate through and access a website.

**Inaccessibility of Website**

42. Mr. Hilbert attempted to access Defendant's Website in July and August from Washington, D.C., in August from Detroit, Michigan, and from Washington, D.C. again in late August and early September, Specifically, on or about September 5, 2023, Mr. Hilbert immediately noticed that the Website's buttons and links failed to abide by the WCAG Guidelines due to their improper labelling and coding.

43. Specifically, as mentioned above, one of the features that Mr. Hilbert relies on as a screen reader user is Quick Navigation, which allows him to efficiently explore websites.

44. Quick Navigation requires proper coding.

45. As Mr. Hilbert began navigating the Atheneum Suite Hotel site using the "L" key on his keyboard to jump from link to link, some links seemed to be embedded within menu item groups.

46. Consequently, this made the Quick Navigation feature unusable.

47. Mr. Hilbert could hear the names of the links like "Book now" and "Our Hotel," but then his screen reader's cursor got stuck.

48. Mr. Hilbert made numerous attempts to unstick it, but he could navigate neither forward nor backward.

49. Mr. Hilbert then attempted to switch his navigation strategy by using the "B" key to explore buttons on the site.

50. However, he received an auditory message saying, "Button not found."

51.     This was a clear indication to Mr. Hilbert that there might be issues with how buttons are coded on the website. Buttons are essential for actions like booking, creating an account, or logging in, and their inaccessibility posed a significant obstacle to Mr. Hilbert's progress forward or backward.

52.     Undeterred, Mr. Hilbert returned to the top of the site and resumed navigating by link.

53.     After some exploration, he found a link labeled "Book now." Mr. Hilbert clicked the link, hoping to proceed with his reservation.

54.     However, he then encountered an inaccessible calendar view. Instead of providing the dates of the month, the calendar displayed days of the week like "Monday," "Tuesday," without any corresponding dates.

55.     Mr. Hilbert's screen reader would read, "Monday blank," "Tuesday blank," and continue in that pattern.

56.     This made it impossible for Mr. Hilbert to select the dates for check-in and check-out.

57.     In contrast, Mr. Hilber recalls using other hotel websites where the calendar was thoughtfully designed to confirm each date selection with a clear message, such as "You selected September 10th for check-in and September 15th for check-out."

58.     Mr. Hilbert felt reassured by such clear messages in the past because they streamlined the reservation process for someone like himself who relied on screen readers.

59.     Ultimately, the issues prevented Mr. Hilbert from selecting his desired dates, viewing pricing, and checking availability, and they overall obstructed his booking process.

60.     In addition to the improper coding and labelling, the Website also fails to implement auditory feedback for screen-reader software users.

61.   When companies fail to implement auditory feedback into their websites, screen-reader software users who solely rely on audio are left confused and are force into a situation where they need to scavenge through a website to merely understand what functions they have successfully interacted with.  This not only requires screen-reader software users to waste a significant amount of time to understand what functions are available to them on a given website, but it often prevents them from being able to access and independently enjoy a website as their sighted counterparts.

62.   Due to the Website's accessibility issues, Mr. Hilbert was ultimately unable to make a reservation.

63.   Defendant represents on its Website that it has "Web Accessibility" when, in fact, it was inaccessible to Mr. Hilbert and other blind consumers.

64.   Mr. Hilbert contacted Defendant's support team through the email address vhodges@atheneumsuites.com and informed it of the Website's accessibility issues. However, the issues were never resolved.

65.   Thereafter, Mr. Hilbert, through his counsel, engaged Defendant in an effort to remediate its Website's accessibility features, but was told that Defendant would not remediate the alleged inaccessible features, claiming that the Website was accessible.

66.   Thereafter, on or about January 22, 2024, Plaintiff revisited the Website again, hoping to make a reservation.  Regrettably, the same problems plagued the Website.

67.   Specifically, when on the homepage of the Website, Mr. Hilbert attempted to use the quick navigation by using the "B" key on the keyboard to navigate by button.  The response that he received from his screen reading software was "button not found". This informed him

immediately that the Website is not labeled in a way where elements can be identifiable through ARIA.

68. Plaintiff then attempted to navigate by link using the "L" key on his keyboard, and the feedback he received from his screen reading software was "Skip to footer, link" followed by "Go to accessibility page, link" followed by "The Atheneum Hotel Hotel, visited link." This result was not clear to him what that link was for. What followed was "Phone link", but when he attempted to navigate further using the L key on his keyboard, the feedback that he received from his screen reading software was "Last link, phone link".

69. Plaintiff then realized that the cursor of his screen reading software got stuck on the previously mentioned link. To unstuck it, he attempted to navigate with his left arrow and then right arrow with no success. He had to un-stick his cursor by stopping to interact with that link by pressing "control option shift and up arrow". The feedback he received then was "Out of menu item group link phone".

70. Mr. Hilbert realized at that point that the group menu items is how most links on Defendant's website are labeled, which is an outdated method of grouping menu items as links per the WCAG guidelines.

71. Mr. Hilbert proceeded to navigate the homepage using the L key on his keyboard and what followed was "Book now link". He then attempted to navigate backward by pressing "Shift L" on his keyboard, and the cursor navigated him to a link titled "COVID-19 Policy link," which he realized such a link was not the one that succeeded the link titled "Book now link".

72. He attempted to navigate forward and backward and realized once again that the cursor had gotten stuck due to the way that link was coded, which was as a group menu item rather

than properly coded link. He un-stuck his cursor and decided to navigate using the "F" (field) key on his keyboard to navigate by field hoping to find fields to type in his arrival and departure dates.

73.    The first field on the homepage was titled "Arrival". Mr. Hilbert typed in his arrival date which was "01/27/2024," and then he navigated to the field that followed it which was "Departure date," where he typed in his departure date which was "01/29/2024". He then navigated using his right arrow to move forward and what followed was a link titled "Book now". He clicked on the link titled "Book now", and the Website seemed to open a new page with the first heading titled "Search bar", followed by a button to choose the "number of adults and children" followed by two buttons.

74.    The first was titled "Check-in Monday January 22, 2024, expanded button", followed by a button titled "Check-out Tuesday January 23, 2024, expanded button". To his surprise, Mr. Hilbert realized that neither of these dates are the dates that he selected and typed in the previous two fields on the previous page. He attempted to select the button titled "Check-in Monday January 22, 2024, expanded button" to change the existing value and received no feedback. He encountered the same experience with the button that follows which is titled "Check-out Tuesday January 23, 2024, expanded button".

75.    Since both of these buttons were expanded, Mr. Hilbert decided to navigate by pressing the F key on his keyboard, but the feedback he received was "text field not found". He then pressed the "T" key on his keyboard hoping to find a calendar view table to change the auto selected dates and choose his desired dates. When he pressed the T key on his keyboard, the feedback he received from his screen reading software was "Table 7 columns 6 rows". He then started to use the right arrow on his keyboard to navigate through the

table, and the feedback he received from his screen reading software was "Su Sunday, column 1 of 7, Mo Monday, column 2 of 7, Tu Tuesday, column 3 of 7, We Wednesday, column 4 of 7, Th Thursday, column 5 of 7, Fr Friday, column 6 of 7, Sa Saturday, column 7 of 7".

76.   Through such feedback, there was no way for him to identify the day of the week that was read to him with the corresponding day of the month which was not being read to him. Mr. Hilbert decided to continue using his right arrow and proceeded to navigate forward and another set of feedback was given to him which read "row 2 of 6 Sunday blank, Monday blank, column 2 of 7, Tuesday blank, column 3 of 7, Wednesday blank, column 4 of 7, Thursday blank, column 5 of 7, Friday blank, column 6 of 7". The result of his interaction with the calendar view was confusing and unproductive to say the least. There was no way for him to select his check-in and out dates from the fields on the homepage or from the calendar view when clicking on the link titled "Book now link".

77.   These access barriers effectively denied Plaintiff the ability to use and enjoy Defendant's Website the same way sighted individuals do in order to seek a stay at Defendant's Hotel independently.

78.   Upon information and belief, Defendant's policies and practices denied Plaintiff, along with other blind or visually impaired users, access to Defendant's Website. Those policies and/or practices therefore specifically denied the goods and services that are offered to the general public.

79.   Due to Defendant's failure and refusal to remove access barriers to its Website, Plaintiff and visually impaired persons have been and are still being denied equal access to

Defendant's Website, and the numerous goods, services and benefits offered to the public through the Website.

80. The access barriers Plaintiff encountered have caused a denial of his full and equal access in the past, and now deter Plaintiff on a regular basis from utilizing the Website, presently and in the future.

81. If the Website was equally accessible to all, Plaintiff could independently navigate the Website and access and complete the desired business transaction through Defendant's Website as sighted individuals do.  He also would not have to use the services of a sighted person to perform simple transactions and interactions with Defendant's Website.  It is humiliating for a visually impaired person to rely upon the largess of sighted strangers to navigate through the world.  The internet world is no different.

82. Through his attempts to use the Website, Plaintiff has actual knowledge of the access barriers that make these services inaccessible and independently unusable by blind and visually impaired persons.

83. Because simple compliance with the WCAG 2.1 Guidelines would provide Plaintiff and other visually impaired consumers with equal access to the Website, Plaintiff alleges that Defendant has engaged in acts of intentional discrimination, including but not limited to the following policies or practices:

a. Constructing and maintaining Website that is inaccessible to visually impaired individuals, including Plaintiff;

b. Failing to construct, update and maintain Website that is sufficiently intuitive so as to be equally accessible to visually impaired individuals, including Plaintiff; and

c. Failing to take actions to correct these access barriers in the face of substantial harm and discrimination to blind and visually impaired consumers, such as Plaintiff, as a member of a protected class.

84. Defendant therefore uses standards, criteria or methods of administration that have the effect of discriminating or perpetuating the discrimination of others, as alleged herein.

85. The Americans with Disabilities Act ("ADA") expressly contemplates the injunctive relief that Plaintiff seeks in this action. In relevant part, the ADA requires:

> In the case of violations of … this title, injunctive relief shall include an order to alter facilities to make such facilities readily accessible to and usable by individuals with disabilities … Where appropriate, injunctive relief shall also include requiring the … modification of a policy …

42 U.S.C. § 12188(a)(2).

86. Upon information and belief, because Defendant's Website has never been accessible, and Defendant does not have, and never had, an adequate corporate policy that is reasonably calculated to cause its Website to become and remain accessible, Plaintiff invokes 42 U.S.C. § 12188(a)(2) and seeks a permanent injunction requiring:

a. That Defendant retain a qualified consultant acceptable to Plaintiff ("Mutually Agreed Upon Consultants") who shall assist it in improving the accessibility of its Website so that the goods and services on them may be equally accessed and enjoyed by individuals with vision-related disabilities;

b. That Defendant work with the Mutually Agreed Upon Consultant to ensure that all employees involved in its Website's development and content development be given web accessibility training on a periodic basis at least two (2) times per year, including onsite training to create accessible content at the design and development stages;

c.  That Defendant work with the Mutually Agreed Upon Consultant to perform an automated accessibility audit on a periodic basis at least two (2) times per year to evaluate whether its Website may be equally accessed and enjoyed by individuals with vision-related disabilities on an ongoing basis;

d.  That Defendant work with the Mutually Agreed Upon Consultant to perform end-user accessibility/usability testing on a periodic basis at least two (2) times per year with said testing to be performed by individuals with various disabilities to evaluate whether its Website may be equally accessed and enjoyed by individuals with vision-related disabilities on an ongoing basis;

e.  That Defendant work with the Mutually Agreed Upon Consultant to create an accessibility policy that will be posted on its Website, along with an e-mail address and tollfree phone number to report disability accessibility-related problems; and

f.  That Defendant and its computer and/or internet experts monitor Defendant's Website for up to two (2) years after the Mutually Agreed Upon Consultant validates that the Website is free of accessibility errors/violations to ensure that it has adopted and implemented adequate accessibility policies.

g.  That Defendant provide Plaintiff's counsel and this Court a report every six (6) months of its efforts to comply and its continued compliance with the ADA, including a representation and warranty that its Website is free of accessibility errors/violations and to ensure that it has adopted and implemented adequate accessibility policies, which remain legally compliant with disability laws, functional and up-to-date.

87.  Web-based technologies have features and content that are modified on a daily, and in some instances, hourly basis and a one-time "fix" to an inaccessible website will not cause

the website to remain accessible without a corresponding change in corporate policies related to those web-based technologies. To evaluate whether an inaccessible website has been rendered accessible, and whether corporate policies related to web-based technologies have been changed in a meaningful and legally-compliant manner that will cause the website and/or mobile applications to remain accessible, Defendant's Website must be reviewed on a periodic basis not less than two (2) times per year using both automated accessibility screening tools and end user testing by disabled individuals.

88. Although Defendant may currently have centralized policies regarding maintaining, updating and operating its Website, Defendant lacks a plan and policy reasonably calculated to make them fully and equally accessible to, and independently usable by, blind and other visually impaired consumers.

89. Defendant has, upon information and belief, invested substantial sums in developing and maintaining its Website and has generated significant revenue from its Website. These amounts are far greater than the associated cost of making its Website equally accessible to visually impaired customers.

**90.** Without injunctive relief, Plaintiff and other visually impaired consumers will continue to be unable to independently use the Website, violating their rights.

**FIRST CAUSE OF ACTION**
**Violation of the Americans with Disabilities Act**
**(42 U.S.C. § 12181 *et seq.*)**

91. Plaintiff, on behalf of himself and other visually impaired persons, repeats and realleges every allegation of the preceding paragraphs as if fully set forth herein.

92. Section 302(a) of Title III of the Americans with Disabilities Act ("ADA"), 42 U.S.C. § 12101, *et seq.*, provides:

No individual shall be discriminated against on the basis of disability in the full and equal enjoyment of the goods, services, facilities, privileges, advantages, or accommodations of any place of public accommodation by any person who owns, leases (or leases to), or operates a place of public accommodation.

42 U.S.C. § 12182(a).

93.     Defendant's Website is a place of public accommodation within the definition of Title III of the ADA, 42 U.S.C. § 12181(7). *See Martinez v. Gutsy LLC*, 2022 U.S. Dist. LEXIS 214830, 2022 WL 17303830, at *1, 7 (E.D.N.Y. Nov. 29, 2022) (on a motion to dismiss, holding that plaintiff plausibly stated a claim of discrimination due to allegedly inaccessible website); *Del-Orden v. Bonobos, Inc.*, 2017 U.S. Dist. LEXIS 209251, 2017 WL 6547902, at *1 (S.D.N.Y. Dec. 20, 2017) (same); *Romero v. 88 Acres Foods, Inc.*, 580 F.Supp.3d 9, 19 (S.D.N.Y. 2022) (collecting cases); *see also Tavarez v. Moo Organic Chocolates, LLC*, No. 21-CV-9816 (VEC), 2022 U.S. Dist. LEXIS 154249, at *2 (S.D.N.Y. Aug. 26, 2022) ("concur[ing] with the vast majority of other judges in this District who have decided the issue that a 'place of public accommodation' includes public-facing websites that are not tethered to a physical location" while "not[ing] that at least seven of its colleagues, one of whom has since ascended to the Second Circuit, have found that Title III of the ADA applies to websites"); *Wilson v. Fabric Cellar, Inc.*, No. 20-CV-244S, 2021 U.S. Dist. LEXIS 130536 (W.D.N.Y. July 13, 2021) (choosing to "assume without deciding" that the website is a place of public accommodation based on the weight of the case law in the circuit); *Slade v. Life Spectacular, Inc.*, No. 22-CV-0037 (ALC), 2022 U.S. Dist. LEXIS 220079, at *9 (S.D.N.Y. Dec. 5, 2022); *Panarese v. Sell It Soc., LLC*, No. 19-CV-3211 (ARR) (RML), 2020 U.S. Dist. LEXIS 119002, at *2 (E.D.N.Y. July 2, 2020), *adopted by* 2020 U.S. Dist. LEXIS 139893, (Aug. 5, 2020); *Reed v. 1-800-Flowers.com,*

*Inc.*, 327 F. Supp. 3d 539, 550 (E.D.N.Y. 2018); *Andrews v. Blick Art Materials, LLC*, 268 F. Supp. 3d 381, 398 (E.D.N.Y. 2017).

94.     The Website is a service offered to the general public and, as such, must be equally accessible to all potential consumers.

95.     Under Section 302(b)(1) of Title III of the ADA, it is unlawful discrimination to deny individuals with disabilities the opportunity to participate in or benefit from the products, services, facilities, privileges, advantages, or accommodations of an entity. 42 U.S.C. § 12182(b)(1)(A)(i).

96.     Under Section 302(b)(1) of Title III of the ADA, it is unlawful discrimination to deny individuals with disabilities an opportunity to participate in or benefit from the products, services, facilities, privileges, advantages, or accommodation, which is equal to the opportunities afforded to other individuals. 42 U.S.C. § 12182(b)(1)(A)(ii).

97.     Under Section 302(b)(2) of Title III of the ADA, unlawful discrimination also includes, among other things:

> [A] failure to make reasonable modifications in policies, practices, or procedures, when such modifications are necessary to afford such goods, services, facilities, privileges, advantages, or accommodations to individuals with disabilities, unless the entity can demonstrate that making such modifications would fundamentally alter the nature of such goods, services, facilities, privileges, advantages or accommodations; and a failure to take such steps as may be necessary to ensure that no individual with a disability is excluded, denied services, segregated or otherwise treated differently than other individuals because of the absence of auxiliary aids and services, unless the entity can demonstrate that taking such steps would fundamentally alter the nature of the good, service, facility, privilege, advantage, or accommodation being offered or would result in an undue burden.

42 U.S.C. §§ 12182(b)(2)(A)(ii) – (iii).

98.     The acts alleged herein constitute violations of Title III of the ADA, and the regulations promulgated thereunder.

99.     Plaintiff, who is a member of a protected class of persons under the ADA, has a physical disability that substantially limits the major life activity of sight within the meaning of 42 U.S.C. §§ 12102(1)(A) – (2)(A).

100.    Furthermore, Plaintiff has been denied full and equal access to the Website offered by Defendant, has not been provided services that are provided to other patrons who are not disabled, and has been provided services that are inferior to the services provided to non-disabled persons.  Defendant has failed to take any prompt and equitable steps to remedy its discriminatory conduct.  These violations are ongoing.

101.    Under 42 U.S.C. § 12188 and the remedies, procedures, and rights set forth and incorporated therein, Plaintiff requests relief as set forth below.

**SECOND CAUSE OF ACTION**
**<u>Violation of the MPDCRA</u>**
**(MCLS § 37.1101, *et seq.*)**

102.    Plaintiff repeats and realleges every allegation of the preceding paragraphs as if fully set forth herein.

103.    The MPDCRA makes it unlawful to "[d]eny an individual the full and equal enjoyment of the goods, services, facilities, privileges, advantages, and accommodations of a place of public accommodation or public service because of a disability that is unrelated to the individual's ability to utilize and benefit from the goods, services, facilities, privileges, advantages, or accommodations or because of the use by an individual of adaptive devices or aids."  MCLS § 237.1302(a).  Defendant is systematically violating the MPDCRA.

104.    Defendant's Website is a service provided by Defendant that is inaccessible to patrons like Mr. Hilbert who are visually impaired.  This inaccessibility has denied those visually impaired full and equal access to the facilities and services Defendant makes available to the non-disabled public.  Defendant has violated the MPDCRA by denying visually impaired customers the services and products provided by the Website.  These violations are ongoing.

105.    Defendant's actions constitute discrimination against Plaintiff on the basis of a disability in violation of the MPDCRA because Defendant constructed and/or maintains its Website, which are inaccessible to Plaintiff, knowingly maintains its Website in this inaccessible form, and has failed to take adequate actions to correct these discriminatory barriers even after being notified of the effects of that discrimination.

106.    Defendant's actions were and are in violation of the MPDCRA and, therefore, Plaintiff and others similarly situated are entitled to injunctive relief remedying the discrimination. MCLS § 37.2801.

107.    Plaintiff is also entitled to a preliminary and permanent injunction enjoining Defendant from violating the MPDCRA and requiring Defendant to take the steps necessary to make its Website readily accessible to and usable by visually impaired individuals.

108.    Defendant's denial of accessible Website and its discrimination against Plaintiff renders it liable for each and every offense for the actual and special damages in an amount to be determined by a jury, and reasonable attorney's fees and costs that may be determined by the Court.  MCLS § 37.2801.

**THIRD CAUSE OF ACTION**
**Declaratory Relief**

109. Plaintiff, on behalf of himself and other visually impaired persons, repeats and realleges every allegation of the preceding paragraphs as if fully set forth herein.

110. An actual controversy has arisen and now exists between the parties in that Plaintiff contends and is informed and believes that Defendant denies that its Website contains access barriers denying blind and/or visually impaired customers the full and equal access to the products, services and facilities contained in its Website, which Defendant owns, operates and controls, fails to comply with applicable laws, including but not limited to Title III of the Americans with Disabilities Act and the MPDCRA, prohibiting discrimination against the blind and visually impaired.

111. A judicial declaration is necessary and appropriate at this time in order that each of the parties may know their respective rights and duties and act accordingly.

**PRAYER FOR RELIEF**

WHEREFORE, Plaintiff respectfully requests this Court grant the following relief:

A.   For a judgment that Defendant violated Plaintiff's rights under the ADA and the MPDCRA;

B.   A preliminary and permanent injunction prohibiting Defendant from violating the Americans with Disabilities Act ("ADA"), 42 U.S.C. §§ 12182, *et seq.*, and the MPDCRA;

C.   A preliminary and permanent injunction requiring Defendant to take all steps necessary to make its Website fully compliant with the requirements set forth in the ADA and its implementing regulations, so that the Website is regularly accessible to and usable by blind and visually impaired individuals;

D.     A declaration that Defendant owns, maintains, and/or operates its Website in a manner that discriminates against the blind and visually impaired persons, and which fails to provide access for persons with disabilities as required by the ADA and the MPDCRA;

E.     Compensatory damages under the MPDCRA in an amount to be determined at trial;

F.     Pre- and post-judgment interest;

G.     An award of costs and expenses of this action together with reasonable attorneys' and expert fees; and

H.     Such other and further relief as this Court deems just and proper.

## JURY TRIAL DEMAND

Pursuant to Fed. R. Civ. P. 38(b), Plaintiff demands a trial by jury on all questions of fact raised by the Complaint.

Dated: Tuesday, February 20, 2024     Respectfully submitted,

**ERIC SIEGEL LAW, PLLC**

By   /s/ Eric L. Siegel
Eric L. Siegel (Bar No. 2344935)
esiegel@ericsiegellaw.com
888 17th Street, N.W., Suite 1200
Washington, D.C. 20006
(202) 946-2962 (Main)
(771) 220-6116 (Direct)
(202) 223-6625 (Facsimile)

*Attorney for Plaintiff Laurel Hilbert*

26

DocuSign Envelope ID: 9140AF40-E2B0-4755-9917-1B72AF68E37C

## VERIFICATION

I, Laurel Hilbert, have read the factual allegations of this Verified Complaint for which I provided direct personal experience and information pertaining to the inaccessibility of Defendant's Websites and verify under the penalty of perjury, pursuant to 28 U.S.C. § 1746, that the foregoing is true and correct. Executed on this day of February 2023.

2/7/2024

DocuSigned by:

*Laurel Hilbert*

DC1A383A843446B...

_____        _____
Date                                    Laurel Hilbert, Plaintiff